UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2021 MAR 26 PM 3: 52

CLERK

BY_____ blw
DEPUTY CLERK

KASEY DEGREENIA-HARRIS,  )
                         )
        Plaintiff,       )
                         )
        v.               )   Case No. 2:19-cv-00218
                         )
LIFE INSURANCE COMPANY,  )
OF NORTH AMERICA,        )
                         )
        Defendant.       )

## OPINION AND ORDER
## DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Doc. 27)

Plaintiff Kasey DeGreenia-Harris brings this action pursuant to 29 U.S.C.
§ 1132(a)(1)(B) against Defendant Life Insurance Company of North America
("Defendant" or "LINA") to recover benefits under a group life insurance policy subject
to the Employee Retirement Income Security Act of 1974 ("ERISA"). Pending before the
court is Defendant's motion for summary judgment. (Doc. 27.)

### I.    Procedural Background.

Plaintiff's Amended Complaint alleges one claim against Defendant for improper
denial of benefits. On April 21, 2020, Plaintiff filed a motion to supplement the
administrative record requesting that the court consider Vermont Occupational Safety and
Health Administration ("VOSHA") records from the incident which resulted in Denny
DeGreenia's death. On May 5, 2020, Defendant opposed that motion, and on May 13,
2020, Plaintiff filed a reply.

On July 15, 2020, while Plaintiff's motion to supplement the administrative record
was pending, Defendant filed a motion for summary judgment. On August 14, 2020,
Plaintiff filed her opposition. On August 25, 2020, Defendant filed a reply.

On October 27, 2020, the court granted Plaintiff's motion to supplement the

administrative record, and thereafter, the court granted Defendant's motion to file a supplemental memorandum in support of its motion for summary judgment. Defendant did so on December 23, 2020. On January 25, 2021, Plaintiff filed an opposition to the supplemental memorandum, and Defendant filed a reply on February 5, 2021. After oral argument on February 22, 2021, the court took the pending motion for summary judgment under advisement.

Plaintiff is represented by Michael F. Hanley, Esq. and Paul J. Perkins, Esq. Defendant is represented by Brooks R. Magratten, Esq. and Evan J. O'Brien, Esq.

## II.      Plaintiff's Submission of Additional Facts and Relevance Challenges.

Plaintiff disputes facts provided by Defendant on relevancy grounds and proffers additional facts which she contends must be considered in determining whether summary judgment is appropriate. Although Local Rule 56 does not contemplate the filing of an additional statement of facts by the non-moving party, the court has, at times, permitted this type of filing. *See, e.g., Elnicki v. City of Rutland*, 2019 WL 131858, at *3 n.2 (D. Vt. Jan. 8, 2019) (holding that although "[p]laintiff[']s response in opposition to the motion for summary judgment contain[ed] both disputed factual contentions and supplemental information interspersed with legal arguments[,]" "the facts presented in [p]laintiff's filing are relevant to the court's analysis of [d]efendants' motion and [d]efendants have not moved to strike them. The court will therefore consider them in resolving the motion"); *Smith v. Shaw's Supermarkets, Inc.*, 2019 WL 1436660, at *1 n.1 (D. Vt. Apr. 1, 2019), *aff'd*, 809 F. App'x 30 (2d Cir. 2020) (concluding that "[a]lthough [p]laintiff's approach to filing is not authorized by this court's Local Rules, in light of the preference for adjudication on the merits, the court considered all relevant facts submitted by [p]laintiff"). In this case, the additional facts proffered by Plaintiff will assist the court in determining whether there are disputed issues of material fact.

With regard to Plaintiff's relevancy challenges, the scope of the court's de novo review extends not only to the interpretation of a benefits plan but to "resolving routine fact disputes[,]" *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 251 (2d Cir. 1999), such as causation. *See Ariana M. v. Humana Health Plan of Tex., Inc.*, 884

F.3d 246, 248 (5th Cir. 2018) (joining "seven other courts of appeals [that] have chimed in[,]" including the Second Circuit, to hold that a de novo standard of review "applies when a beneficiary challenges a plan denial based on a factual determination of ineligibility"). Plaintiff has requested and has been permitted to supplement the administrative record with VOSHA records. Against this backdrop, Plaintiff should not be heard to complain when the court considers all of the information LINA considered in denying benefits.

### III.   The Undisputed Facts.

Plaintiff is a resident of Essex Junction, Vermont. Her father, Denny DeGreenia, now deceased, was a resident of Concord, Vermont and an employee at the Burke Mountain Operating Company ski area ("Burke Mountain") in East Burke, Vermont.

While employed at Burke Mountain, Mr. DeGreenia was a participant in an employee welfare benefit plan (the "Plan") sponsored by Jay Peak, Inc. ("Jay Peak"). The Plan provides benefits in the event of a participant's death due to a "Covered Accident" pursuant to a group insurance policy, No. SOK-603590, issued by LINA to Jay Peak. At all relevant times, LINA served as the Claim Administrator and insurer with respect to the Plan.

Mr. DeGreenia designated his daughter, Plaintiff, as the beneficiary for all Accidental Death benefits payable under the Plan.[1] The Plan states "[w]e will pay the benefit for any one of the Covered Losses listed in the *Schedule of Benefits*, if the Covered Person suffers a Covered Loss resulting directly from a Covered Accident within the applicable time period specified in the *Schedule of Benefits*." (Doc. 28-1 at 319) (emphasis in original). The Plan defines "Covered Accident" as:

> [a] sudden, unforeseeable event that results, directly in a Covered Injury or Covered Loss and meets all of the following conditions:
>
> 1. occurs while the Covered Person is insured under this Policy;

---

[1] The Plan provides Basic Accidental Death coverage in the amount of Mr. DeGreenia's annual compensation, rounded up to the nearest $1,000, which in this case is $40,000. In addition to Basic Accidental Death coverage, Mr. DeGreenia elected an additional $300,000 in coverage under the Plan for a total of $340,000 in Accidental Death coverage.

> 2. is not contributed to by disease, Sickness, mental or bodily
> infirmity;
>
> 3. is not otherwise excluded under the terms of this Policy.

*Id.* at 308.[2] A "Covered Loss" is defined as "[a] loss that is all of the following: 1. the direct result of a Covered Accident; 2. one of the Covered Losses specified in the *Schedule of Covered Losses*; 3. suffered by the Covered Person within the applicable time period specified in the *Schedule of Benefits*." *Id.* (emphasis in original).

At the time of his death, Mr. DeGreenia had worked at Burke Mountain for over twenty-five years and was a "manager of snowmaking and knew his role well." (Doc. 32 at 5) (internal quotation marks omitted). On December 17, 2017, he died while working at Burke Mountain in the course of operating a snowcat machine, a "truck-sized continuous track vehicle with an enclosed cab[]" *id.* at 6 (internal quotation marks omitted), on the Big Dipper ski slope near the intersection of Toll Road on Burke Mountain, which was "snow covered and had a steep upward grade." *Id.* (internal quotation marks omitted). At the time of the incident, the weather was overcast and cold and Mr. DeGreenia was using the snowcat to access a snow gun and repair its hose. Clifford Savage was a passenger in the snowcat. Both he and Mr. DeGreenia were not wearing seatbelts.

The snowcat was "on a significant incline covered with ice and snow" when it began to slide before coming to a stop, after which Mr. DeGreenia backed up the snowcat and again attempted to ascend the slope. At this point, "the vehicle rotated and became perpendicular to the intended line of travel and rolled over" (Doc. 32 at 6) (internal

---

[2] To the extent that Plaintiff asserts "provisions of this ERISA-governed policy 'are to be read in their ordinary and popular sense and in accordance with the federal common law or rights and obligations developed for ERISA-regulated plans[,]'" (Doc. 32 at 4) (quoting *Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 257 (2d Cir. 2004)), this does not raise a genuine dispute of material fact. *See Timsina v. United States*, 2019 WL 3254689, at *2 (D. Vt. July 19, 2019), *aff'd*, 835 F. App'x 633 (2d Cir. 2020) ("To the extent Plaintiffs' responses to Defendant's statement of undisputed material facts are more properly characterized as legal arguments, they will be disregarded because a legal argument cannot create a disputed fact under Fed. R. Civ. P. 56.").

quotation marks omitted). It is not clear whether Mr. DeGreenia was ejected from the snowcat. *Compare* Doc. 28-1 at 168 ("The vehicle continued to slide and eventually rolled over ejecting the operator."), *with* Doc. 49 at 4 ("Mr. Savage was ejected and was not injured; Mr. DeGreenia was not ejected").

Mr. Savage left the scene to get help. Mr. DeGreenia died at the scene due to "rib fractures and visceral lacerations due to blunt force trauma of the torso." (Doc. 49 at 4) (internal quotation marks omitted). Postmortem examination showed "[a]brasions and marking consistent with decedent striking the internal lever controls on the machine during the rollover." (Doc. 28-1 at 160.)

Vermont State Police ("VSP") inspected Mr. DeGreenia's body at the scene and after it was transported to the ski patrol building on the mountain and found a "small bag of green leafy substance believed to be marijuana[]" in the pocket of Mr. DeGreenia's pants. (Doc. 32 at 7.) The substance was not tested.

According to the VSP's report (the "VSP Report"), "Anna [DeGreenia, Mr. DeGreenia's wife,] advised recently she remembers [Mr. DeGreenia] telling her that the [snowcat] had issues with traction and they had been trying to get it fixed." *Id.* at 7-8 (third alteration in original).

In the VSP Report, the following observations were made:

There was never any prior mention of suicide by the deceased nor did we locate anything at the scene to indicate suicide as a possibility.

. . . Anna [DeGreenia, Mr. DeGreenia's wife] stated last night [the night before the accident] Denny was happy due to Burke Mountain getting him and his department new uniforms.

. . . Anna [DeGreenia, Mr. DeGreenia's wife] advised Denny had been dealing with a bad tooth but had been feeling better.

. . . [Clifford] Savage [the passenger in the snowcat] stated he and Denny were traveling up the Big Dipper trail in the 1500 track vehicle in order to change a water hydrant.

. . . We also learned that the deceased and passenger were wearing helmets[.]

. . . [Clifford] Savage stated they were wearing helmets[.]

5

> . . . Mark [McCaughey, Mr. DeGreenia's co-worker,] also stated Denny
> always made them wear their helmets when operating the 1500.
>
> . . .
>
> . . . I spoke to Anna De[G]reenia . . . Anna explained Denny had worked at
> Burke Mountain for approximately 25 years.
>
> . . . Mack [McCaughey] stated Denny had been operating the 1500 for 25
> years and if anyone knew how to operate it correctly it was Denny.

(Doc. 31 at 1-3.)

The Chief Medical Examiner of the Vermont Department of Health ("OCME")
conducted an autopsy on Mr. DeGreenia which was memorialized in a Final Report of
Autopsy[3] dated January 22, 2018, which determined that the manner of death was an
"accident." A toxicology screen was performed using samples of blood, urine, and
vitreous fluid from Mr. DeGreenia, the findings of which were summarized in a
Toxicology Report. OCME reports also contain an initial Investigative Report,[4] dated
December 17, 2017. On April 11, 2018, OCME released a Final Report of Autopsy,
Toxicology Report, and Investigative Report to LINA. LINA was also provided with the
VSP Report and Workers' Compensation Employer First Report of Injury form.

The Final Report of Autopsy noted a "Final Pathological Diagnosis" of "I. Blunt
Force Trauma of Torso . . . II. Blunt Force Trauma of Right Arm . . . III. Abuse of Illicit
Substances (see Toxicology)." (Doc. 28-1 at 149) (citations omitted). The Toxicology
Report indicates that Mr. DeGreenia's femoral blood and urine had evidence of cocaine
and its metabolites, cannabinoids, and THC. With regard to the detection of illicit
substances based on urine analysis, the Toxicology Report notes "[t]his test is an
unconfirmed screen. Confirmation by a more definitive technique such as GC/MS is
recommended." *Id.* at 154.

---

[3] As Plaintiff points out, Defendant has not disclosed an expert witness or fact witness to lay a
foundation for the Final Report of Autopsy. Plaintiff therefore argues it is inadmissible. The
court defers ruling on this issue until Defendant has had an opportunity to respond.

[4] This document is titled "Medical Examiner Report" in the administrative record. (Doc. 28-1 at
157-61.)

On December 27, 2017, Plaintiff submitted a proof of loss to LINA to initiate a claim for life and accidental death insurance benefits. As part of its investigation into Mr. DeGreenia's death, LINA retained toxicologist Frederick W. Fochtman, PhD, to evaluate Mr. DeGreenia's condition at the time of the incident. Dr. Fochtman is a forensic toxicologist and a Fellow of the American Board of Forensic Toxicology. He reviewed the Toxicology Report, which showed that Mr. DeGreenia's postmortem femoral blood contained:

- 26 ng/mL cocaine;
- 89 ng/mL benzoylecgonine;
- 14 ng/mL delta-9 THC;
- 23 ng/mL delta-9-carboxy-THC;
- 3.5 ng/mL 11-hydroxy delta-9 THC.

Based on these findings, Dr. Fochtman opined that:

> [t]he amounts of cocaine . . . and THC . . . would indicate that Mr. DeGreenia had recently used the drugs. The quantity of cocaine would not be considered toxic, but likely from a moderate to low dose. The quantity of THC found is within the range reported for individuals under the influence and showing impairment.
>
> . . .
>
> It is unlikely that Mr. DeGreenia's use of cocaine would have impaired his driving abilities, particularly if he had been either an occasional or regular user of cocaine. Cocaine is a stimulant and the quantities found in his postmortem blood would not indicate that he had used a quantity to produce toxicity and impairment.
>
> . . . The quantity of THC and metabolites found in Mr. DeGreenia's postmortem femoral blood is within the range of reported recent use and impairment from marijuana use. His use of marijuana would explain any lack of judgment that led to the accident resulting in his death.
>
> . . . Cocaine as a stimulant would decrease any sedation produced by THC, but would not decrease THC's impairing effect. Mr. DeGreenia would have felt more alert, but would still be experiencing the impairing effect of marijuana.

*Id.* at 140-41.[5]

LINA concluded that Mr. DeGreenia was impaired while operating the snowcat and that, because of that impairment, his death was foreseeable and therefore not a covered accident. On June 11, 2018, LINA denied Plaintiff's claim and informed Plaintiff she could appeal the claim determination and "provide proof that [Mr.] DeGreenia's death was the result of a Covered Accident, as defined by the policy, and is not otherwise excluded under the terms of the policy. This may include, but is not limited to, expert forensic review." (Doc. 32 at 15) (internal quotation marks omitted). LINA grounded its denial of Plan benefits on the following rationale:

> Mr. DeGreenia purposefully embraced the dangerous nature and potential consequences of his actions. Serious injury or death are foreseeable outcomes of driving while under the influence of drugs. Therefore, it is our assertion that his voluntary conduct constituted the significant assumption of an undue risk. . . . LINA has determined that a reasonable person [of] similar age, background, and age-based experience would have understood that serious injury or death would be highly likely to occur while operating a motor vehicle while under the influence of cocaine and marijuana. Based on the above reasoning, we have determined that Mr. DeGreenia's snow utility machine rollover was a foreseeable outcome of his voluntary actions. As a result, it does not meet the definition of Covered Accident.

(Doc. 27-1 at 5.)

On September 13, 2018, Plaintiff appealed LINA's initial determination, asserting that "there is little, if any, evidence to support the notion that Mr. DeGreenia was impaired at the time of the tragic accident that took his life" and disputing the ability to determine his impairment based on the Toxicology Report. (Doc. 32 at 16) (internal quotation marks omitted). As part of her appeal, Plaintiff's former attorney, David Sleigh, Esq., submitted a September 13, 2018 letter, stating in relevant part:

> It is uncontested that Mr. DeGreenia was a veteran snow making operator

---

[5] Plaintiff challenges the admissibility of Dr. Fochtman's opinions and notes that he has not been disclosed as an expert witness. The court defers ruling on this issue until Defendant has had an opportunity to respond. *See Edgar v. Disability Reinsurance Mgmt. Servs., Inc.*, 741 F. Supp. 2d 1268, 1271 (N.D. Ala. 2010) (concluding, in an ERISA denial of benefits case, "[t]his court does not pretend to have the right, much less the ability, to decide a controversy based upon unsworn opinions and unseen, uncross-examined witnesses").

and that he had done his job for many years without a previous serious accident. Simple inquiry from those who knew him would have established that he was also a longtime daily pot smoker. Given that his marijuana use had never before adversely impacted his ability to safely operate snow-making equipment, it is specious to suggest that a positive marijuana test . . . demonstrates his understanding that he was "highly likely" to cause serious bodily injury or death that evening.

. . . Ian Touchette was a snowmaker who worked with DeGreenia for 8 months on the 7 a.m. - 7 p.m. shift. On the day DeGreenia died . . . [h]e did not see Denny use marijuana on that day, and he said he was around him for extended periods of time. They were doing gun runs together and hanging out in the office between gun runs. He said DeGreenia did not appear to be high - no glassy eyes, no odor of pot around. Ian acknowledged that he knew Denny was an occasional pot smoker but definitely did not see him use on that day.

. . . Mack McCaughey worked with DeGreenia full time for four years prior to the accident. . . . Mack was within eyeshot of DeGreenia for almost the whole day and did not think he was high. He saw no signs of intoxication of any sort. Mack said DeGreenia was an excellent boss and he never knew him to use drugs on the job. DeGreenia had worked at the Mountain for 26 years and never had a problem.

. . . Cliff Savage was in the "1500" groomer with DeGreenia at the time of the accident. He had been with him for the entire four hours prior thereto. He believes DeGreenia was 100 percent sober when they went out to work that evening. Cliff knew DeGreenia used pot, but never knew him to use while at work. In Cliff's words, "I can 100 percent say I was with him throughout that day. I can tell you, he was not stoned or under the influence while we were in the 1500. He was not high. I didn't smell anything on him. He definitely was not stoned. He was completely sober when we were going up in the 1500."

(Doc. 31 at 3-4) (alteration in original).[6]

In considering Plaintiff's appeal, Defendant retained a second toxicology expert, Jerrold Leikin, MD, to determine "the physical and/or mental function impairments

---

[6] The contents of Attorney Sleigh's September 13, 2018 letter are undisputed; however, whether the evidence set forth therein is admissible has not yet been determined. *See Gordon v. New England Cent. R.R., Inc.*, 2019 WL 5084160, at *1 (D. Vt. Oct. 10, 2019) (holding on summary judgment that "[w]hile the content of the evidence submitted to support or dispute a fact must be admissible, 'the material may be presented in a form that would not, in itself, be admissible at trial'") (quoting *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017)).

caused by Mr. DeGreenia's use of cocaine and marijuana based on toxicology results." (Doc. 32 at 18.)[7] Dr. Leikin reported: "[t]he cocaine values along with the metabolite . . . are indicative of use of cocaine within hours of Mr. DeGreenia's death"; "Mr. DeGreenia was at increased risk for being involved in an accident, and thus impaired, due to the level of cocaine found in his system and the use of cocaine within hours of the event"; "[t]he effects of cocaine at the levels indicated in the Toxicology Report would be expected to include impaired judgment along with incoordination and visual perceptual abnormalities"; "[b]ased on federal Department of Transportation (DOT) regulations, it is the standard of care that individuals do not operate motor vehicles after cocaine exposure"; "the level of THC present in the Toxicology Report indicated impaired judgment, increase in reaction time, incoordination, and visual perceptual abnormalities"; "Mr. DeGreenia was at increased risk from being involved in an accident, and thus impaired, due to the level of marijuana found in his system"; "[b]ased on DOT regulations, it is the standard of care that individuals do not operate motor vehicles after marijuana exposure." *Id.* at 19 (internal quotation marks omitted).[8]

On January 8, 2019, LINA upheld its denial of Accidental Death benefits based on the following determination:

> The evidence supports that [Mr. DeGreenia] consumed cocaine and marijuana and then operated a vehicle up a snow covered trail with a steep upward grade. A person with the amounts of cocaine and marijuana in his system would be experiencing significant impairments to judgment, increased reaction time, incoordination and visual perceptual abnormalities especially in judging speed and distance. In addition to being in this inherently dangerous environment, Mr. DeGreenia was impaired by cocaine and marijuana use. Given all these factors, a reasonable person, with background and characteristics similar to Mr. DeGreenia would have viewed the resulting death as highly likely to occur.

---

[7] Plaintiff disputes Dr. Leikin's qualifications to offer expert witness opinions and notes he has not been disclosed as a witness. The court defers ruling on the admissibility of this evidence until Defendant has an opportunity to respond. *See Edgar*, 741 F. Supp. 2d at 1271.

[8] Dr. Leikin also noted that the amount of impairment from cocaine and marijuana could not be "quantitate[d]" but nonetheless "concluded that Mr. DeGreenia was at increased risk for being involved in an accident, and thus impaired[.]" (Doc. 28-1 at 36.)

Because the evidence supports that the actions leading to Mr. DeGreenia's death made his death foreseeable, his death was not caused by an accident as defined by the policy, and no benefits are payable.

(Doc. 27-1 at 7-8.)

## IV.   The VOSHA Records.

The Vermont Department of Labor's Employer First Report of Injury form states: "Describe what employee was doing: Driving snowcat up a trail" and "Was this the employee's regular occupation? Yes[.]" (Doc. 28-1 at 217.) From December 18, 2017 until June 22, 2018, a VOSHA employee investigated Mr. DeGreenia's death as a workplace fatality, interviewing Burke Mountain's General Manager, Jay Peak and Burke Mountain's Safety Officer, Burke Mountain's Maintenance Manager, Mr. Savage, and a number of Mr. DeGreenia's co-workers. The review included snowcat maintenance records, photographs of the snowcat, the manufacturer's manual for the snowcat, investigative findings, opinions on the cause of the accident, a citation of Burke Mountain for its violations of workplace safety regulations, Burke Mountain's corrective action plan, and Burke Mountain's satisfaction of the fines imposed as a result of Mr. DeGreenia's death.

The VOSHA investigator noted that "[h]istorically, when the [snowcat] had many ice caulks broken or missing and they were not able to be replaced the [snowcat] would be parked and not used." (Doc. 39, Exh. 1 at 373) (footnote supplied). Although "[g]rousers were regularly replaced, those equipped with ice caulks were not replaced with the same." *Id.* at 323. "[A]pproximately 30 grousers that were equipped with ice caulks were replaced with [ones] that were not equipped with the ice caulks." *Id.* at 71. This was relevant to causation because "while [ice caulks] are not always required[,] they increase the [s]nowcat's ability [to] operate on steeper slopes that are covered in hard packed snow or ice and is recommended in the operator manual[.]" *Id.* at 381.

The VOSHA investigator further noted that "[w]hen inspecting the operator seat belt, I found that the male end of the latch mechanism was not on the webbing of the belt, but locked into the female receptacle, missing an internal component[,]" *id.* at 263, and that:

Snow maker [redacted] stated that neither he or the driver were wearing seat belts because he believed that there were none there. It was discovered during the investigation that there were indeed seatbelts[;] however[,] the driver['[s seatbelt was defective and did not work. Mr. [redacted] has been riding in this equipment for two years without a seatbelt.

*Id.* at 373 (redactions in original).

The VOSHA investigator concluded that the following events and conditions contributed to a vehicle rollover in which Mr. DeGreenia suffered fatal injuries:

- The employer did not have a vehicle operation policy[.]

- The employer did not ensure the seatbelts worked in the [snowcat.]

- The employer did not take progressive corrective measures to ensure employees operated vehicles in a safe manner.

. . .

- The employer did not ensure vehicles with known defective equipment were taken out of service until repaired.

*Id.* at 323. Burke Mountain was issued the follow citation:

**Citation 1 Item 1**   Type of Violation: **Serious**

29 CFR 1910.178(p)(1): If at any time a powered industrial truck is found to be in need of repair, defective, or in any way unsafe, the truck shall be taken out of service until it has been restored to safe operating condition.

. . .

Violation: On or about December 17, 2017 employees were allowed to use the [snowcat] that was not in safe operating condition.

. . .

**Citation 1 Item 2**   Type of Violation: **Serious**

29 CFR 1910.178(l)(4)(ii)(A): Refresher training, including an evaluation of the effectiveness of that training, shall be conducted as required by paragraph (l)(4)(ii) to ensure that the operator has the knowledge and skills needed to operate the powered industrial truck safely. The operator has been observed to operate the vehicle in an unsafe manner.

. . .

Violation: On or about December 17, 2017 the employer had not taken steps to retrain an employee that had been observed operating a company vehicle in an unsafe manner. It was a known fact that the snowmaking

supervisor was a risk taker, and would regularly operate the . . . [s]nowcat
and snowmobiles in an unsafe manner.

. . .

**Citation 1 Item 3**   Type of Violation: **Serious**

29 CFR 1910.178(q)(5): All parts of any such industrial truck requiring
replacement shall be replaced only by parts equivalent as to safety with
those used in the original design.

. . .

Violation: On or about December 17, 2017 the . . . [s]nowcat was allowed
to be operated by employees after the seats had been replaced with ones
that were not original manufacturer equipment. Also, approximately 30
grousers that were equipped with ice caulks were replaced with [ones] that
were not equipped with the ice caulks.

*Id.* at 70-71.

On June 14, 2018, the Director of Safety & Risk at Burke Mountain signed a

"Certification of Corrective Action Worksheet[,]" *id.* at 74, in which he reported that the

snowcat was removed from service and sold "as is" for $1.00 on March 22, 2018.

VOSHA's closing statement noted:

After full investigation by this officer, it is revealed that this event was the
result of a culmination of critical events and violative conditions which are
alleged to have been present in the workplace. . . . [T]his incident could
have and should have been avoided, had the employer taken proper action
prior to the incident.

*Id.* at 323. "VOSHA agree[d] to reduce the overall penalties" against Burke Mountain

"from $34,224 to $20,534[]" based on its abatement measures, including selling the

snowcat and "institut[ing] a training program for all operators of snow equipment such as

snowmobiles and groomers." *Id.* at 63.

## V.    Conclusions of Law and Analysis.

### A.    De Novo Review Applies.

As the court held in *DeGreenia-Harris v. Life Ins. Co. of North America*, 2020

WL 6281573, at *2-3 (D. Vt. Oct. 27, 2020), review of Plaintiff's denial of benefits claim

is governed by the de novo standard because "the discretionary clause is void[,]" "the

Policy itself does not provide . . . discretion[,]" and "no other provision of the Policy is

13

cited by Defendant as according it 'discretionary authority to determine eligibility for benefits or to construe the plan's terms[.]'" *Id.* at *3 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 102 (1989)).

"When applying the *de novo* standard of review, the [c]ourt reviews 'all aspects of the denial of an ERISA claim[.]'" *McDonnell v. First Unum Life Ins. Co.*, 2013 WL 3975941, at *11 (S.D.N.Y. Aug. 5, 2013) (quoting *Kinstler*, 181 F.3d at 245). In a de novo review, a court affords no deference to LINA's administrative interpretation of the Plan documents or its conclusion regarding the merits of the claim, but rather "reaches its own conclusion about whether the plaintiff has shown, by a preponderance of the evidence, . . . entitle[ment] to benefits under the plan[.]" *Id.* at *12.

**B.     Summary Judgment Standard.**

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). The court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in his favor." *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012).

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "A non-moving party cannot avoid summary

14

judgment simply by asserting a 'metaphysical doubt as to the material facts.'" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Moreover, not all disputes of fact are material – "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

"The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted).

Defendant asserts that Plaintiff is not entitled to the usual inferences on summary judgment because:

> in an ERISA case where review is based only on the administrative record before the plan administrator and is an ultimate conclusion as to disability to be drawn from the facts, summary judgment is simply a vehicle for deciding the issue. This means the non-moving party is not entitled to the usual inferences in its favor. When there is no dispute over plan interpretation, the use of summary judgment in this way is proper regardless of whether our review of the ERISA decision maker's decision is de novo or deferential.

*Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005), *cert. denied*, 546 U.S. 937 (2005). In the Second Circuit, however, the summary judgment standard remains unaltered in the context of ERISA:

> Although there is no right to a jury trial in a suit brought to recover ERISA benefits, *see, e.g.*, *Tischmann v. ITT/Sheraton Corp.*, 145 F.3d 561, 568 (2d Cir. 1998), and thus the district court would have been the factfinder at trial, the district court's task on a summary judgment motion—even in a nonjury case—is to determine whether genuine issues of material fact exist for trial, not to make findings of fact. *See, e.g.*, *Vona v. Cnty. of Niagara*, 119 F.3d 201, 205 n.4 (2d Cir. 1997). Sometimes in ERISA cases parties make a "motion for judgment on the administrative record," which we have observed is "a motion that does not appear to be authorized in the

> Federal Rules of Civil Procedure." *Muller v. First Unum Life Ins. Co.*, 341
> F.3d 119, 124 (2d Cir. 2003). If such a motion is treated as a summary
> judgment motion, the district court must limit its inquiry to determining
> whether questions of fact exist for trial. *Id.*

*O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 642 F.3d 110, 116 (2d Cir. 2011).

Unlike the First Circuit, the Second Circuit continues to apply the usual inferences on

summary judgment; the only potential exception is where the standard of review is

arbitrary and capricious. *See, e.g.*, *Anderson v. Sotheby's, Inc.*, 2006 WL 1722576, at *14

(S.D.N.Y. June 22, 2006) (holding "[w]here review is properly confined to the

administrative record before the ERISA plan administrator, . . . there are no disputed

issues of fact for the court to resolve. Because judicial review is limited to the

administrative record, the district court sits in effect as an appellate court to determine

whether the denial of ERISA benefits was arbitrary and capricious") (internal quotation

marks and footnotes omitted).

### C.    Whether Defendant is Entitled to Summary Judgment that its Denial of Coverage was Correct and in Accordance with the Plan.

"ERISA plans are construed according to federal common law. [A c]ourt will

review the [p]lan as a whole, giving terms their plain meanings." *Fay v. Oxford Health

Plan*, 287 F.3d 96, 104 (2d Cir. 2002) (citation omitted). At issue in this case is whether

Mr. DeGreenia's death falls within the definition of "Covered Accident" under the Plan.

"For death under an accidental death policy to be deemed an accident, it must be

determined (1) that the deceased had a subjective expectation of survival, and (2) that

such expectation was objectively reasonable, which it is if death is not *substantially likely*

to result from the insured's conduct." *Critchlow v. First UNUM Life Ins. Co. of Am.*, 378

F.3d 246, 263 (2d Cir. 2004) (emphasis in original).

> Under the subjective/objective analysis, *[t]he court first asks whether the
> insured subjectively lacked an expectation of death or injury. See Wickman
> v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1088 (1st Cir.1990)
> ("Requiring an analysis from the perspective of the reasonable person in the
> shoes of the insured fulfills the axiom that accident should be judged from
> the perspective of the insured."). *If so, the court asks whether the
> suppositions that underlay the insured's expectation were reasonable, from
> the perspective of the insured, allowing the insured a great deal of latitude

> *and taking into account the insured's personal characteristics and experiences. See id.* If the subjective expectation of the insured cannot be ascertained, the court asks whether a reasonable person, with background and characteristics similar to the insured, would have viewed the resulting injury or death as substantially certain to result from the insured's conduct.

*Id.* at 257-58 (emphasis and alteration in original) (quoting *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1126 (9th Cir. 2002)). The Second Circuit in "*Critchlow* strictly applies the *Wickman* standard requiring the 'reasonableness' of the decedent's expectations of survival be evaluated by determining whether death or serious injury was 'highly likely' or 'substantially certain' to occur." *Glynn v. Bankers Life & Cas. Co.*, 432 F. Supp. 2d 272, 281 (D. Conn. 2005) (quoting *Critchlow*, 378 F.3d at 258).

Defendant contends that Mr. DeGreenia's death is not a "Covered Accident" under the Plan because his subjective expectations cannot be ascertained and because any expectation of survival he had was not objectively reasonable in light of his impairment while operating heavy machinery on an ice- and snow-covered slope. Defendant further asserts that the Toxicology Report is "dispositive" (Doc. 47 at 3) and "cannot be disputed." (Doc. 51 at 4); *see also* Doc. 33 at 9 (observing that any expectation of survival "was born in the fog of [Mr. DeGreenia's] drug use" and "[a]ny sober individual[] . . . should be very concerned about death or serious injury resulting from Mr. DeGreenia's actions") (emphasis omitted).

In contrast, Plaintiff notes that LINA, OCME, and VSP investigators as well as the Vermont Certificate of Death all identified Mr. DeGreenia's death as an "accident" or accidental. Use of this term, however, is not determinative. *See Schmidt v. Metro. Life Ins. Co.*, 2009 WL 2982918, at *6 (W.D. Mo. Sept. 14, 2009) (concluding that "the medical examiner's determination as to whether the death was an accident is not determinative because it does not take into account the language in the ERISA-governed plans at issue"). More persuasive is the VOSHA investigator's conclusion that "this incident could have and should have been avoided, had the *employer* taken proper action prior to the incident." (Doc. 28-1 at 323) (emphasis supplied).

Plaintiff further contends Mr. DeGreenia had a subjective expectation of survival based on his operation of the snowcat on a non-expert trail,[9] evidence that he intended to replace hoses on the trail, and evidence that he wore a helmet while operating the snowcat. She also cites Mr. DeGreenia's long history of traversing steep ice- and snow-covered ski trails as evidence of his subjective expectation of survival.[10]

As to whether Mr. DeGreenia's expectation of survival was objectively reasonable, Plaintiff contends there are disputed issues of fact regarding whether Mr. DeGreenia was actually impaired in light of eyewitness evidence to the contrary and his status as a habitual marijuana user.[11] In addition, she argues that LINA's toxicology reports are unreliable because they do not quantify Mr. DeGreenia's degree of impairment.

A majority of courts reject a per se rule that renders a death non-accidental if the decedent consumed drugs or alcohol prior to the incident, unless there is also a significant

---

[9] Plaintiff asserts that the trail was ranked a level two out of four, with one being the least steep and four being the steepest. She submits no evidence in support of this claim.

[10] *See, e.g.*, *Critchlow*, 378 F.3d at 259 (finding that the decedent's subjective expectation of survival was "amply supported by the police reports that [he] 'ha[d] escape measures built into his binds'; that 'these cords had evidently been attached to a set of counter weights which were meant to give him an out if he started to lose consciousness'; and that just hours before his death [he] had shopped at a grocery store and left items on the kitchen counter indicating that he was 'planning supper'") (citations and internal quotation marks omitted); *Glynn v. Bankers Life & Cas. Co.*, 432 F. Supp. 2d 272, 281 (D. Conn. 2005) (noting that "the decedent had a very stable short-term employment and financial situation as well as established long-term leisure plans[]" and concluding "[m]ore than mere conclusory statements of the decedent's possible subjective intent are needed to raise a genuine issue of material fact[] . . . that the decedent intentionally inflicted any injury upon himself").

[11] The Second Circuit has held that evidence that an activity was habitual is relevant to determining whether a decedent's subjective expectation of survival is objectively reasonable. *See, e.g.*, *Critchlow*, 378 F.3d at 260 ("[The decedent] had survived the practice of autoerotic asphyxiation for some 20 years, with no evidence of any injurious effects; and on the night of his death he had, by all accounts, set up an elaborate escape mechanism designed to save him if he began to lose consciousness. His subjective belief that he would survive what turned out to be his final episode cannot be considered objectively unreasonable."); *Martin v. Hartford Life & Accident Ins. Co.*, 478 F. App'x 695, 698 (2d Cir. 2012) (noting "the evidence submitted by [the plaintiff] . . . addressed her husband's alleged negligence—tending to show, for instance, that he had engaged in similar conduct without apparent injury in the past").

degree of reckless or intentional behavior.[12] In this case, although LINA proffers significant evidence of impairment, that evidence has not been tested by cross-examination and reflects conflicting opinions.[13] LINA's toxicologists do not address the

_____

[12] *Compare Danouvong v. Life Ins. Co. of N. Am.*, 659 F. Supp. 2d 318, 325-26 (D. Conn. 2009) (holding that even when applying the arbitrary and capricious standard, "[w]e cannot say categorically or as a *per se* rule that a particular activity would not fall within the definition of 'Accident' because determination of eligibility for benefits 'does depend on the individual facts and circumstances in each case'"); *Stamp v. Metro. Life Ins. Co.*, 531 F.3d 84, 91 (1st Cir. 2008) (holding that "[t]he *Wickman* analysis does not require a categorical determination that all alcohol-related deaths are per se accidental or nonaccidental. Rather, it leads us to consider the circumstances of the fatal event in question"); *Eckelberry v. Reliastar Life Ins. Co.*, 469 F.3d 340, 345 (4th Cir. 2006) (concluding that "[w]e do not understand [the insurer] to have applied a per se rule to [the insured's] case. The simple fact that drunk driving occurred does not mean there was no accident under the policy. If the insurer did not intend to cover any injury to a drunk driver, then drunk driving would have been a specific exclusion listed in the plan."); *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1110 (7th Cir. 1998) (ruling that "[w]e do not mean to suggest that [the insurer] could sustain a determination that all deaths that are causally related to the ingestion of alcohol, even in violation of law, could reasonably be construed as not accidental. . . . When the insured engages in conduct that results in a loss that could not have been reasonably anticipated, a rational interpretation could not deny coverage."), *with Walker v. Metro. Life Ins. Co.*, 24 F. Supp. 2d 775, 782 (E.D. Mich. 1997) (finding that "a reasonable person in the decedent's shoes would have known that driving while intoxicated at twice the legal limit was highly likely to result in serious injury or death"); *McGillivray v. Life Ins. Co. of N. Am.*, 519 F. Supp. 2d 157, 168-69 (D. Mass. 2007) (observing that "[a] reasonable person (a) who checked out of detox against medical advice, (b) was told at the time of checkout that he was likely to relapse and was at risk from seizures and DTs, (c) was stopped less than three hours later for driving the wrong way down a street and arrested for operating a motor vehicle under the influence of liquor, (d) had his license to drive revoked, (e) was held in police custody for a period of about ten hours, (f) had a court appearance, and then (g) commenced driving while ingesting substantial quantities of alcohol over a two and a half hour period 'would have viewed [an] injury as highly likely to occur'") (internal footnote omitted) (second alteration in original); *Lennon v. Metro. Life Ins. Co.*, 504 F.3d 617, 622 (6th Cir. 2007) (noting that "[the insured's] extremely high blood-alcohol content, the manner in which [his] car flew off the road, the lack of an alternative explanation for the death, and [his] driving the wrong way down the street—that rendered at least reasonable [the insurer's] conclusions that [he] did not die as a result of an 'accident' under the [p]lan"); *Miller v. Auto-All. Int'l, Inc.*, 953 F. Supp. 172, 176-77 (E.D. Mich. 1997) (concluding that "no reasonable trier of fact could find that [the insurer's] determination to deny benefits under the . . . policy was unreasonable[ ]" because given "common knowledge and the current opprobrium in the media and legal system for driving while intoxicated, the decedent should have reasonably foreseen that death or serious injury may result from his actions").

[13] LINA's toxicologists do not appear to agree regarding whether the cocaine in Mr. DeGreenia's system would render him impaired or would act as a counterbalance to the sedative effect of the marijuana. *Compare* Doc. 28-1 at 141 (Dr. Fochtman's opinion that "[c]ocaine is a stimulant and

absence of evidence that Mr. DeGreenia was operating the snowcat in an unusual or reckless manner.

Although "courts across the country have upheld plan administrators' determinations that deaths are not 'accidental' when the decedent is under the influence of drugs or alcohol at the time of an accident and no other apparent cause of the incident exist[,]" this same outcome is not dictated where there is other evidence of causation. *Werbianskyj v. Zurich Am. Ins. Co.*, 2016 WL 4076367, at *8 (N.D. Ind. Aug. 1, 2016) (concluding that a death was not accidental where a toxicology report revealed that the decedent had ingested THC and "[p]laintiff submitted *no competing evidence . . .* to call into question the conclusions of [the defendant's expert]") (emphasis supplied); *see also Clark v. Life Ins. Co. of N. Am.*, 950 F. Supp. 2d 1348, 1356 (N.D. Ga. 2013) ("A reasonable person with [the decedent's] college education and experience riding a motorcycle on the road at issue would know the dangerous effects that alcohol and marijuana would have on the ability to ride downhill towards a curve. Importantly, *there were no other factors* that could have contributed to [the decedent's] loss of control, crash and death.") (emphasis supplied); *Noonan v. Hartford Life Ins. Co.*, 2009 WL 3126855, at *2 (E.D.N.Y. Sept. 25, 2009) (concluding that the decedent's intentional ingestion of cocaine was the "end of the story[]" in the context of a policy which authorized payment of benefits only for injuries "resulting directly and *independently of all other causes*") (emphasis in original).

Here, there are contested issues of fact regarding what caused the snowcat's rollover and the ejection of Mr. DeGreenia from the snowcat's cab. The fact that Mr. Savage survived the same incident without apparent injury and did not observe any

---

the quantities found in his postmortem blood would not indicate that he had used a quantity to produce toxicity and impairment"), *with* Doc. 28-1 at 36 (Dr. Leikin's opinion that the effects of cocaine at the level indicated in the Toxicology Report "would be expected to include impaired judgment along with incoordination and visual perceptual abnormalities" but that the degree of impairment could not be "quantitate[d]"); *see also White v. Life Ins. Co. of N. Am.*, 892 F.3d 762, 769 (5th Cir. 2018) (rejecting reliance of Dr. Fochtman's toxicology opinion because he conceded "an estimation of [the decedent's] level of impairment cannot be done").

reckless operation or impairment on Mr. DeGreenia's part is, alone, evidence that must be considered. Because there are genuine issues of disputed material fact and the parties have not consented to have them resolved on summary judgment, the court may proceed no further. *O'Hara*, 642 F.3d at 116 (recognizing the court "may make factual findings[]" based upon the parties' filings if it is "clear that the parties consent to a bench trial on the parties' submissions[]").

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is DENIED. (Doc. 27.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 26th day of March, 2021.

Christina Reiss, District Judge
United States District Court